COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:  Chief Judge Huff, Judges Humphreys and O'Brien
Argued at Fredericksburg, Virginia


KEVIN CODY

                                                          OPINION BY
v.      Record No. 0599-17-4                    JUDGE ROBERT J. HUMPHREYS
                                                        APRIL 17, 2018
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Jeanette A. Irby, Judge

Alexis Downing (King Downing PLC, on briefs), for appellant.

Katherine Quinlan Adelfio, Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Appellant Kevin Cody ("Cody") was convicted on February 16, 2017, in the Circuit

Court of Loudoun County (the "circuit court") for strangulation of another to cause wounding or

injury, in violation of Code § 18.2-51.6, assault and battery of a family member, in violation of

Code § 18.2-57.2, and five counts of violation of a protective order, in violation of Code

§ 16.1-253.2.  The circuit court granted the Commonwealth's motion to admit out-of-court

statements of Rebekka Weingarten ("Weingarten") over the objection of Cody that doing so

violated his Sixth Amendment right to confront the witnesses against him.  In doing so, the

circuit court applied the doctrine of forfeiture by wrongdoing, finding that the Commonwealth

proved "by a preponderance of the evidence that [Weingarten was] unavailable as a witness and

that [Cody] intended to, and did, by his wrongdoing, procure her unavailability."  Cody appeals

this decision and argues that the trial court erred in finding that he intended to and did procure

the unavailability of Weingarten thereby forfeiting his right to confront her under the Sixth

Amendment because he repeatedly contacted Weingarten in violation of a then-existing

protective order, urged her not to cooperate with the prosecution, and Weingarten subsequently invoked her Fifth Amendment privilege and refused to testify against Cody.[1]

## I. BACKGROUND

Cody and Weingarten have two young children together and have lived together for several years. On January 15, 2016, at approximately 2:00 p.m. and while the children were taking a nap, Cody and Weingarten had an argument. During the argument, Cody strangled Weingarten until she lost consciousness. Cody also punched Weingarten in the chest and left side, and stepped on her back.

Later that same day, at approximately 5:00 p.m., Weingarten drove to the Loudoun County Sheriff's Office. Finding the office closed, she called 911. During the 911 call which was recorded and admitted into evidence, Weingarten told the emergency dispatcher "I'm in the process of leaving a very dangerous man, and I don't know where to go." Weingarten stated that she and her children were "sitting in front of the sheriff's office" and "I need to report him, I need to find out what I can do." When asked by the dispatcher "[w]hat do you mean, you need to report him; what happened?", Weingarten replied

> I have bruises; he's been kicking me and hitting me, and he's choked me to the point of passing out, for the second time in two days. It's just been going on so many years. I just packed up and left because he's at work right now. I don't—I don't know what to do.

She also told the emergency dispatcher that the incident occurred at her home and that after "he left . . . I packed the kids, and I filled-up, and I'm in my car." Weingarten expressed concern for her children stating, "I have two small children in the back seat; I haven't explained

---

[1] Cody's assignment of error does not challenge the admission of Weingarten's statements on any ground other than as a violation of the Sixth Amendment's Confrontation Clause, and we offer no opinion regarding the admissibility of the statements in question under the Virginia Rules of Evidence.

- 2 -

anything to them." The emergency dispatcher told Weingarten to wait at the sheriff's office and that an officer would meet her there.

Soon after the 911 call, Deputy Sheriff Robert Jacobsen ("Deputy Jacobsen") arrived at the Loudoun County Sheriff's Office. According to Deputy Jacobsen, Weingarten was visibly trembling, crying, and "sad and angry at the same time." As described by Deputy Jacobsen, Weingarten stated that after she "put her children down for a nap . . . Cody confronted her about a consistent on-going issue of his thoughts that she is being flirtatious and lying at work." At some point during the conversation, Cody "grabbed [Weingarten] with his hands around her neck until she passed out." She stated that Cody continued to hit her once she regained consciousness. At that time, Cody punched her in the chest. Weingarten also explained that, at one point, she remembered being on her hands and knees when Cody punched her in the side and stepped on her back. Cody then threatened to kill Weingarten, the children, and himself because of her actions. Weingarten also reported bruising from a beating and strangulation in the preceding days, as well as repeated verbal threats to her life and the children's lives.

After observing Weingarten's injuries, which included redness around her neck and heavy bruising, Deputy Jacobsen asked if Weingarten would be willing to see a forensic nurse examiner about her injuries. Deputy Jacobsen subsequently provided her with the address of Fairfax Inova Hospital (the "hospital") and followed Weingarten to that location.

Weingarten met with Rebecca Bottoms ("Ms. Bottoms"), a forensic nurse examiner, at the hospital. Ms. Bottoms examined Weingarten "head-to-toe" to identify and document her injuries and to determine their seriousness and possible treatment. Ms. Bottoms then reduced her findings to a "Medical/Legal Report of Examination for Diagnosis and Treatment" (the "Medical/Legal report"), which contained documentation of Weingarten's injuries as observed

and measured by Ms. Bottoms, photographs of the injuries, and a narrative of the events of January 15, 2016, as reported by both Deputy Jacobsen and Weingarten.[2]

On January 19, 2016, Sergeant Janet Schmidt ("Sergeant Schmidt"), the domestic violence coordinator for the Loudoun County Sheriff's Office, met with Weingarten for a follow-up interview. There, Weingarten recounted the events of January 15, 2016. Sergeant Schmidt also photographed her injuries, which included "a lot of yellow bruising on [Weingarten's] chest." Weingarten indicated that "she wanted to have this all finished up, so she wouldn't have to continue looking over her shoulder in fear of [Cody]" and "at the very least, to keep [Cody] in jail for a while." Sergeant Schmidt also listened to a voicemail on Weingarten's cell phone where Cody threatened suicide. Notably, Weingarten's statements to Sergeant Schmidt about the events of January 15, 2016, as testified to by Sergeant Schmidt, mirrored her statements to Deputy Jacobsen and Ms. Bottoms.

Officers subsequently arrested Cody on warrants alleging strangulation and domestic assault. The Loudoun County Juvenile and Domestic Relations District Court (the "J&DR court") also issued an emergency protective order, followed by a preliminary protective order (the "protective order"), which prohibited Cody from contacting Weingarten. In obtaining the protective order, Weingarten executed an affidavit in support of her petition for a preliminary protective order. There, she made statements under oath which were consistent with her statements to Deputy Jacobsen, Ms. Bottoms, and Sergeant Schmidt.

With the protective order in effect and while he was incarcerated, Cody made five phone calls to Weingarten. In an attempt to circumvent the protective order, Cody utilized the inmate account of "John Halteh," an inmate incarcerated in the same pod as Cody. Cody introduced

---

[2] Referred to as the "Circumstances of the Incident" section in the Medical/Legal report.

himself as "John" during each of the five phone calls rather than by his actual name. All of these calls were recorded by the jail.

Cody made his first phone call to Weingarten on January 31, 2016. Cody repeatedly begged her to forgive him and give him another chance, to let him come home, to be a family again, to visit him in jail, to drop the protective order and charges, and to not help the prosecution or appear in court. As characterized by the circuit court, Cody was "emotionally manipulative during those phone calls." For example, at the outset of the phone conversation, Cody professed his love for Weingarten and their children.

> [Cody]: Listen, I don't care what's happened in the last two weeks; none of it matters to me. Since I've been here, I have hit absolute bottom, and I know I can fix it. . . . I love you as much as I love those kids. And I don't care what you've done, I don't care what you've said; it doesn't matter.

Weingarten, however, repeatedly indicated that she did not feel safe with Cody. She explained to Cody that she went to the police because she feared for her life. Cody never denied harming Weingarten. Instead, Cody repeatedly insisted that Weingarten needed to trust him and stated that he could not help her or their children in jail. In response, Weingarten stated that she "couldn't swallow without pain for a week."

During the first phone call, Cody also reminded Weingarten that she once said that their relationship "could be magical; you were right." Cody repeatedly stated that he loved Weingarten and their children and emphasized that two weeks in jail changed his perspective on life.

> [Cody]: Listen, . . . it's not even about trust, it's about—what I have learned is, it is about acceptance; that's what I've had to learn here more than anything else: Is, that when it reaches a point where, you know, things aren't the way I would like them to be, or perfect, or whatever, it doesn't matter. If I can get to a point where I can accept progress and better [sic], I'm telling you[.]
>
> . . . .

- 5 -

[Cody]:  I can't even explain to you the difference in my head in here, in over the last two weeks.  I am begging you, I am begging you, let me have one chance.

Cody also stated that he understood that his actions violated the protective order.

[Cody]:  When I called you tonight, . . . I know that I'm taking a huge risk by calling you, . . . .  If you want to turn around and turn this into another violation, and say that I violated the protective order—I don't know if you dropped it or not you told Dan I could; it's totally up to you.

Weingarten stated that she was not going to report Cody's phone call because she "wanted to hear what [Cody] had to say."

When Weingarten stated that she did not intend on giving Cody another chance, Cody stated "if you don't do it now, it is going to be over, and it will not be something you can come back from."  After making more promises, Cody continued to ask for another chance.

[Cody]:  I need you to trust me enough to give me one chance.  I have never asked you for a chance before; how many chances have I given you?

How many times have I put up with your failings; how many times?  Ask me that.

How many times have I lived with absolute torture, because of things that you knew you were supposed to do, you wanted to do, and you failed?  And how many times did I let you back?

I want you to give me one chance in my entire fucking life; how is that too much to ask?

And how do you not—at least for the fucking children—how can you not give them one chance, how can you not give them one chance?

After Weingarten stated "[y]ou understand that I can't undo what I've already done[,]" Cody suggested that Weingarten not cooperate with the prosecution and drop the charges against him.

[Cody]: It doesn't matter; everything can be undone.

[Weingarten]: There's still going to be—

[Cody]: —what are you talking about, quickly.

[Weingarten]: There's still going to be court dates, there's still pictures—

[Cody]: —you can drop charges, you can not show up.

And, honestly, I don't even care, I don't even care; I don't care what I have to suffer.

It's not about—look, I'm not trying to go back to where we were, I'm not trying to go back to as though nothing ever happened.

Cody begged Weingarten to visit him the forthcoming Tuesday and, after the automated alert system alerted to the remaining time, asked Weingarten to "drop the protective order" so that he could call "without fear of getting extra charges." Weingarten responded, "I'll think about it." Subsequently, Cody once again begged for forgiveness and invoked Cody and Weingarten's family.

[Cody]: Please, I need to know. I need this, [our sons] need this, and you need this. Please, I am running out of time, literally; give me some hope . . . I'm begging, let me fix my family.

[Weingarten]: Do you have any idea how scared I've been of you for years; do you have any idea? (Crying)

[Cody]: I—listen, I am going to fix that.

[Weingarten]: I don't—how could I possibly believe that?

Soon after, time expired and the first phone call ended.

Cody called Weingarten a second time approximately twelve minutes after the first phone call ended. Cody placed two more phone calls on February 1, 2016, within less than half an hour of each other, and the last phone call on February 2, 2016. Notably, Cody repeatedly begged or directed Weingarten to drop the protective order during each of the four subsequent phone calls.

- 7 -

For example, during the third phone call, Cody stated "[p]lease, I need you to do two things. I need you to get the protective order annulled, or whatever; [l]et go of that, so that I can actually contact them. But I need you to drop the charges." And, during the fourth phone call, Cody stated "[i]deally, I need two things from you: to not have the contact order, and to drop [the] charges. Just because you drop charges, doesn't mean that the charges won't go through; it just makes it more likely for me to actually be able to beat the charges legally[.]" Before the fourth phone call ended, Cody stated "[l]ook, you have all the cards. All I'm asking you to do is put the cards down, forget about your plan, forget about where you think you're locked into. . . . I promise you, you will not be disappointed."

Following Cody's fifth phone call, Weingarten retained the services of an attorney. On February 18, 2016, Weingarten and her attorney appeared before the J&DR court at which time Weingarten's attorney requested that the protective order be "dropped." On February 24, 2016, the J&DR court entered a consent order that amended the conditions of Cody's bond and permitted contact between Cody and Weingarten.

After dropping the protective order, Weingarten refused to cooperate with the Commonwealth in its efforts to prosecute Cody. On March 24, 2016, at the preliminary hearing in the general district court, Weingarten asserted her Fifth Amendment privilege against self-incrimination. As a result, the general district court dismissed the felony strangulation charge and the Commonwealth *nolle prosequied* the domestic assault and battery charge.

On April 12, 2016, a Loudoun County grand jury indicted Cody for felony strangulation of another to cause wounding or injury, in violation of Code § 18.2-51.6, misdemeanor assault and battery of a family member, in violation of Code § 18.2-57.2, and five counts of misdemeanor violation of a protective order, in violation of Code § 16.1-253.2. The five

misdemeanor offenses for violating the protective order resulted from Cody's five phone calls from jail to Weingarten.

On April 29, 2016, the Commonwealth filed a "Motion to Admit Hearsay Statements of Alleged Victim Pursuant to the Defendant's Forfeiture of his Objection Thereto by Wrongdoing" (the "motion to admit Weingarten's statements"). The Commonwealth alleged that Weingarten would decline to testify by invoking her Fifth Amendment privilege against self-incrimination, making her unavailable to testify, which the Commonwealth directly attributed to "[Cody's] deliberate efforts to prevent [Weingarten] from cooperating with the prosecution."

On May 16, 2016, Cody filed a "Motion to Deny Hearsay Statements to a Forensic Nurse Examiner as Testimonial Hearsay as Defined by Crawford and Its Progeny" (the "motion to deny Weingarten's statements"). There, Cody argued that Weingarten's out-of-court statements to Ms. Bottoms were clearly "created for the express purpose of facilitating state laws pertaining to the reporting and examination of abuse and/or neglect" and inadmissible unless Weingarten was made available for cross-examination under the Sixth Amendment. Further, Cody noted that law enforcement officers referred Weingarten to the hospital "upon making a report[,] . . . questioned [Weingarten] about acts of violence beyond that required to make a diagnosis[,] . . . and the subsequent report was explicitly a 'Medical/Legal Report' 'created for the express purpose of facilitating state laws pertaining to the reporting and examination of abuse and/or neglect.'"

On August 3, 2016, Weingarten's attorney sent a letter to the Assistant Commonwealth's Attorney prosecuting Cody. The letter twice stated, in capital letters, that Weingarten did "NOT" want the case prosecuted and that she "wants ALL charges dropped against . . . Cody." The letter also indicated that "if called to testify [Weingarten] will assert her [Fifth] Amendment right against self-incrimination and will not testify." The Commonwealth subsequently offered

Weingarten immunity for everything except lying at trial under oath. Despite this, Weingarten refused to testify.

On September 14, 2016, the circuit court held a hearing on both the Commonwealth's motion to admit Weingarten's statements and Cody's motion to deny Weingarten's statements.[3] On October 4, 2016, the circuit court released a detailed nine-page letter opinion granting the Commonwealth's motion. The circuit court stated that it "listened carefully and considered not only [Cody's] words to [Weingarten] but his demeanor and tone during those calls." It also detailed Cody's "emotionally manipulative" behavior and statements to Weingarten.

The circuit court then addressed the main issue presented by the opposing motions before it—whether the doctrine of forfeiture by wrongdoing permitted the Commonwealth to introduce all of Weingarten's out-of-court statements. After providing a summary of applicable precedent from the United States Supreme Court—specifically Crawford v. Washington and its progeny— the circuit court found that "violation of a protective order pursuant to [Code] § 16.1-253.2 constitute[d] wrongdoing by [Cody]." As a result, the circuit court then sought to determine "whether or not this wrongdoing resulted in [Weingarten] pleading the Fifth Amendment and refusing to testify and whether or not that was [Cody's] intent when he placed those calls in violation of the protective order."

In the absence of clear precedent in the Commonwealth, the circuit court relied upon case law providing persuasive authority from other jurisdictions to apply the doctrine of forfeiture by wrongdoing to Weingarten's out-of-court statements. Primarily, the circuit court relied upon United States v. Gray, 405 F.3d 227 (4th Cir. 2005), a case where the United States Court of

---

[3] Cody also filed a motion to sever counts 1 and 2, which alleged strangulation and assault and battery on a family member, from counts 3-7, which alleged that Cody violated the protective order by placing five phone calls to Weingarten while Cody was incarcerated. The circuit court subsequently denied Cody's motion to sever in its October 4, 2016 opinion letter.

Appeals for the Fourth Circuit acknowledged—in a citation—that forfeiture by wrongdoing extends to situations where a defendant "significantly interferes" with the declarant's appearance as a witness, "including the exercise of 'persuasion and control' or an instruction to invoke the Fifth Amendment privilege[.]" Id. at 242 (citing Steele v. Taylor, 684 F.2d 1193, 1201 (6th Cir. 1982)). And, returning to the facts of the present case, the circuit court explained:

> The calls themselves revealed a pattern of manipulation not uncommon in domestic abuse cases. It was apparent from these calls that [Cody] slowly wore down [Weingarten] with his persistence. There is no question that [Cody] significantly interfered with [Weingarten] as a witness in making those calls. Likewise, it is apparent from those calls that [Cody] used his control over [Weingarten] to persuade [her] not to testify against him. Although he did not explicitly tell [Weingarten] that she should "take the Fifth," [Cody] repeatedly told her that she should drop the charges and that she should not come to court. When [Weingarten] told [Cody] that she had been subpoenaed and that she had to testify, [Cody] stated, "You don't, you actually don't. I've talked to people and you don't."

Based upon its factual findings and its review of case law regarding the doctrine of forfeiture by wrongdoing, the circuit court found that the Commonwealth proved by a preponderance of the evidence that Weingarten was "unavailable as a witness and that [Cody] intended to, and did, by his wrongdoing, procure her unavailability." As a result, the circuit court granted the Commonwealth's motion to admit all of Weingarten's statements. Because the circuit court concluded that Cody had forfeited his right to confront Weingarten, it did not individually analyze whether or not each of Weingarten's out-of-court statements were subject to the protections of the Sixth Amendment. Instead the circuit court determined that "[b]ecause . . . the doctrine of forfeiture by wrongdoing applie[d] to all of [Weingarten's] prior statements, the [circuit court] need not analyze whether or not each of the statements were testimonial in nature[.]"

On October 21, 2016, Cody filed a motion to continue, indicating *inter alia* that he desired further clarification regarding limits on the admissibility of Weingarten's statements to the emergency dispatcher, law enforcement officers, and the forensic nurse examiner. Soon after, Cody filed four motions *in limine*—the first objecting to Weingarten's statements to Ms. Bottoms, the second objecting to Weingarten's statements to law enforcement, the third objecting to Weingarten's 911 call, and the fourth objecting to the introduction of audio recordings of Cody's five phone calls to Weingarten, which Cody later withdrew.

On October 24, 2016, the circuit court held a hearing on Cody's motions *in limine*. There, the Commonwealth argued that pursuant to the circuit court's October 4, 2016 letter opinion, all of Weingarten's statements were admissible because "forfeiture by wrongdoing applies equally to hearsay as it does to confrontation." Subsequently, the circuit court determined that all of her out-of-court statements were admissible and denied Cody's three remaining motions *in limine* in a letter opinion dated January 3, 2017. Regarding Weingarten's statements to Ms. Bottoms, the circuit court determined that pursuant to Rule 2:803(4) of the Commonwealth's Rules of Evidence, Weingarten's out-of-court statements "were for the purpose of medical diagnosis and treatment." And, examining Weingarten's out-of-court statements to law enforcement, the circuit court found that these statements "were deliberate narrative statements made to an investigating officer in the course of an investigation" but that they were "nonetheless, admissible due to [Cody's] forfeiture by wrongdoing[.]" Turning to the remaining motion *in limine* regarding Weingarten's statements to the emergency dispatcher, the circuit court "[found] based on the totality of the circumstances that [Weingarten's] statements constitute[d] an excited utterance" and that "[t]he mere fact that [Weingarten] was answering questions [did] not alone negate the spontaneity of her statements."

On February 16, 2017, a bench trial took place. As a preliminary matter, Cody moved for the circuit court to reconsider its earlier rulings with respect to the admission of all of Weingarten's out-of-court statements. Cody also offered a sworn affidavit in which Weingarten asserted that, after retaining independent legal counsel, she intended to assert her Fifth Amendment privilege against self-incrimination. The affidavit indicated that Cody's phone calls did not contribute to Weingarten's decision to hire an attorney or assert her privilege against self-incrimination. According to Weingarten's affidavit, "[t]hose were my decisions and remain my decisions." The circuit court denied Cody's motion without elaboration.

The Commonwealth called Weingarten as its first witness. During the Commonwealth's limited direct examination, Weingarten identified Cody as the defendant in the matter before the circuit court and confirmed that Cody was the father of her children. On cross-examination, Cody's counsel asked Weingarten if she wanted to provide any commentary on the allegations against Cody. In response, Weingarten invoked her Fifth Amendment privilege against self-incrimination. Weingarten testified that her lawyer advised her to do so. And, when asked "[i]s it his decision or your decision to assert the privilege against self-incrimination[,]" Weingarten responded, "[m]ine."

Thereafter, the Commonwealth called Ms. Bottoms, Sergeant Schmidt, and Deputy Jacobsen to testify regarding the statements made to them by Weingarten concerning the offenses, and admitted the recording of Weingarten's 911 call. The Commonwealth also called Deputy Kathy Franck of the Loudoun County Sheriff's Office to authenticate the call report and recordings of Cody's phone calls to Weingarten which were also admitted. Cody did not call any witnesses or offer any evidence.

The circuit court convicted Cody of all charges. On March 10, 2017, the circuit court sentenced Cody to a total of eleven years in prison with all but two years and one month

- 13 -

suspended.[4]  On March 20, 2017, the circuit court entered a final sentencing order.  This appeal follows.

## II.  ANALYSIS

### A.  Standard of Review

"[O]rdinarily, 'the determination of the admissibility of relevant evidence is within the sound discretion of the trial court subject to the test of abuse of that discretion.'"  Henderson v. Commonwealth, 285 Va. 318, 329, 736 S.E.2d 901, 907 (2013) (quoting Beck v. Commonwealth, 253 Va. 373, 384-85, 484 S.E.2d 898, 905 (1997)).  "Constitutional arguments, however, 'present questions of law that this Court reviews *de novo*.'"  Campos v. Commonwealth, 67 Va. App. 690, 702, 800 S.E.2d 174, 180 (2017) (quoting Crawford v. Commonwealth, 281 Va. 84, 97, 704 S.E.2d 107, 115 (2011)).  However, in conducting our *de novo* analysis, this Court "is bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them."  McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (2004) (*en banc*).

### B.  Whether the Sixth Amendment Applies to the Out-of-Court Statements

Differing from other cases applying forfeiture by wrongdoing to an unavailable witness' out-of-court statements, the present case concerns Cody's procurement of Weingarten's Fifth Amendment unavailability—a case of first impression in the Commonwealth.

---

[4] During the sentencing hearing, the circuit court referenced the pictures of Weingarten's injuries, recalling "the boot print on [Weingarten's] chest from the blow that you gave her in addition to all of the other bruises and marks all over her body."  The circuit court, noted that "the pictures speak a thousand words.  They speak so much more than I could ever say about what happened.  And, certainly, the phone calls are a reminder to me of how quickly you anger when you don't get your way and how abusive you become[.]"

Cody argues that the circuit court erred in finding that he intended to and did procure the unavailability of Weingarten's testimony at trial and, as a result, finding that Cody forfeited his right to confront Weingarten under the Sixth Amendment.

The Confrontation Clause guarantees that a criminal defendant will have the opportunity "to be confronted with the witnesses against him." U.S. Const. amend. VI. The protections afforded by the Confrontation Clause, however, are not absolute. The United States Supreme Court has made clear that the Confrontation Clause applies only to "testimonial" statements. See Crawford v. Washington, 541 U.S. 36, 68-69 (2004) (determining that the Constitution requires confrontation of a declarant only "[w]here testimonial statements are at issue"); see also Giles v. California, 554 U.S. 353, 376 (2008) ("[O]nly *testimonial* statements are excluded by the Confrontation Clause."). Consequently, a witness' out-of-court testimonial statement against a defendant is inadmissible "unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." Melendez-Diaz v. Massachusetts, 557 U.S. 305, 309 (2009).

Given our dual obligations to decide cases on the "narrowest and best grounds" coupled with that to avoid deciding constitutional issues if possible, it follows that the first step in any Confrontation Clause analysis involves determining whether the statements in question are subject to constitutional protection under the Sixth Amendment. See Smith v. Commonwealth, 68 Va. App. 399, 413, 808 S.E.2d 848, 854 (2018) (referencing Commonwealth v. White, 293 Va. 411, 419, 799 S.E.2d 494, 498 (2017)). In that vein, we must determine whether any of Weingarten's out-of-court statements are "testimonial" within the meaning of Crawford and its progeny.

To determine whether a statement is testimonial, "we objectively evaluate the circumstances in which the encounter occur[ed] and the statements and actions of the parties."

Michigan v. Bryant, 562 U.S. 344, 359 (2011). In doing so, this Court "look[s] to all of the relevant circumstances." Id. at 369; see also Sanders v. Commonwealth, 282 Va. 154, 162, 711 S.E.2d 213, 217 (2011) (referencing Crawford, 541 U.S. at 68). "Although we will not disturb on appeal decisions regarding the admissibility of evidence absent an abuse of the trial court's discretion, we review *de novo* whether a particular category of proffered evidence is testimonial hearsay." Holloman v. Commonwealth, 65 Va. App. 147, 170, 775 S.E.2d 434, 446 (2015) (quoting Caison v. Commonwealth, 52 Va. App. 423, 434, 663 S.E.2d 553, 559 (2008) (internal quotations and citations omitted)).

"[A] statement cannot fall within the Confrontation Clause unless its *primary* purpose was testimonial." Ohio v. Clark, 135 S. Ct. 2173, 2180 (2015) (emphasis added). Testimonial statements are the "sort [that] cause the declarant to be a 'witness.'" Davis v. Washington, 547 U.S. 813, 821 (2006). The Supreme Court has explained that, in the context of a police interrogation, statements are testimonial when "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Clark, 135 S. Ct. at 2180 (quoting Davis, 547 U.S. at 822). Statements made "to individuals who are not law enforcement officers . . . are much less likely to be testimonial than statements to law enforcement officers." Id. at 2181. Applying the Crawford line of cases from the United States Supreme Court, our own Supreme Court has "held that a statement is testimonial if its *primary* purpose is 'for use in an investigation or prosecution of a crime.'" Adjei v. Commonwealth, 63 Va. App. 727, 745, 763 S.E.2d 225, 233 (2014) (emphasis added) (quoting Sanders, 282 Va. at 164, 711 S.E.2d at 218 (determining that a laboratory report was non-testimonial because it was "created for medical treatment purposes")).

Accordingly, in the wake of Crawford, Davis, Clark, and Sanders, this Court must first determine a threshold issue that the circuit court did not—whether each of Weingarten's

out-of-court statements constitute testimonial hearsay such as to even trigger a Confrontation Clause analysis. If the primary purpose of the conversation was *not* for use in an investigation or prosecution of a crime, then the Confrontation Clause plays no role in its admissibility. See Clark, 135 S. Ct. at 2180; see also Bryant, 562 U.S. at 359 ("Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause."). However, if the primary purpose of the conversation seeks to "establish or prove past events potentially relevant to later criminal prosecution[,]" then the Confrontation Clause applies and this Court must subsequently determine whether the doctrine of forfeiture by wrongdoing permitted the admission of Weingarten's out-of-court statements notwithstanding the Sixth Amendment's mandate that a defendant be provided the right to confront witnesses against him. See Clark, 135 S. Ct. at 2179-80 (quoting Davis, 547 U.S. at 822). With the foregoing in mind, we turn to examining each of Weingarten's statements admitted at trial.

### 1. The 911 call

"In Davis, 'the Supreme Court considered whether an interrogation that occurred during a 911 call produced testimonial statements.'" Wilder v. Commonwealth, 55 Va. App. 579, 589-90, 687 S.E.2d 542, 547 (2010) (quoting United States v. Proctor, 505 F.3d 366, 371 (5th Cir. 2007)). The Supreme Court noted that while emergency dispatchers are not law enforcement officers they may be "agents of law enforcement when they conduct interrogations of 911 callers." Davis, 547 U.S. at 823 n.2. Expanding upon the issue, the Court recognized that a 911 call, "and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." Id. at 827. "The question before us . . . then, is

- 17 -

whether, objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements." Id. at 826.

Examining all of the relevant circumstances, including the circuit court's findings of fact regarding Weingarten's demeanor and state of mind, we conclude that Weingarten's statements to the emergency dispatcher were not made "with a primary purpose of creating an out-of-court substitute for trial testimony." Clark, 135 S. Ct. at 2180. Weingarten was neither acting as a witness, nor was she testifying. The recording of the call reveals no interrogation by the emergency dispatcher of Weingarten for the primary purpose of prosecution. Rather, the emergency dispatcher was simply eliciting identifying and other information to determine the nature and type of emergency from a caller claiming to be a victim of an assault, including, her name and address, the nature of any injuries, and whether or not Weingarten and her children were in a safe location. Further, the fact that Weingarten was audibly frightened, anxious, and provided vague details is what prompted additional inquiry by the emergency dispatcher. The mere fact that Weingarten identified Cody as the person who assaulted her during the call does not alter the fact that the primary purpose of Weingarten's statements to the emergency dispatcher was to seek help and safety for herself and her children because she "didn't know what do." Without more, the mere fact that statements are made in a 911 call does not automatically classify those statements as testimonial. See id. ("[T]he existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry."). Applying the distinction noted by Justice Scalia in Davis, Weingarten was primarily "describ[ing] current circumstances requiring police assistance" not past events for the purpose of prosecution. See Davis, 547 U.S. at 827. Thus, we hold that Weingarten's statements to the emergency dispatcher were not testimonial and the Confrontation Clause of the Sixth Amendment did not bar their admission.

### 2. The Medical/Legal Report and Statements to Ms. Bottoms

In <u>Clark</u>, the Supreme Court declined categorically to exclude statements to non-law enforcement personnel from the scope of the Confrontation Clause. At the same time, however, the Court concluded that "such statements are much less likely to be testimonial than statements to law enforcement officers." <u>Clark</u>, 135 S. Ct. at 2181. Further, our Supreme Court has determined that certain documents, like medical reports created for treatment purposes, are nontestimonial. <u>See</u> <u>Sanders</u>, 282 Va. at 164-65, 711 S.E.2d at 218. The same is true for statements made to obtain medical treatment. "This is so because statements made for medical treatment purposes are not made in anticipation of or for use in an investigation or prosecution of a crime." <u>Id.</u> at 164, 711 S.E.2d at 218.

The fact that Weingarten went to the hospital upon Deputy Jacobsen's suggestion and that the Medical/Legal report contains a disclaimer informing the patient that the report "has been created for the express purpose of facilitating state laws pertaining to the reporting and examination of abuse and/or neglect" are certainly factors for consideration but are not dispositive of whether Weingarten's statements to Ms. Bottoms and as recorded in the Medical/Legal report are testimonial in nature. Deputy Jacobsen suggested that Weingarten see a forensic nurse examiner upon viewing her injuries, which required medical attention. The circuit court reached a similar conclusion in its January 3, 2017 letter opinion where it found "that [Weingarten's] statements to Ms. Bottoms were for the purpose of treatment and that the external source of [Weingarten's] injuries—[Cody]—were reasonably pertinent to that treatment."

The report is styled "Medical/Legal Report of Examination for Diagnosis and Treatment." Clearly, while the use of the word "Legal" implies possible use in court, its primary purpose expressed in the title is "Examination for Diagnosis and Treatment." Moreover,

considering Weingarten's statements to Ms. Bottoms in their entirety, including those contained in the Medical/Legal report, the primary purpose, though certainly not the only purpose, of Weingarten's statements was to obtain medical diagnosis and possible treatment, not for the prosecution of a criminal offense. During the examination, which took place at a hospital, Weingarten made statements to a registered forensic nurse examiner and not to a law enforcement officer. Ms. Bottoms, the forensic nurse examiner, subsequently reduced her findings to a Medical/Legal report after examining Weingarten for injuries. And, while Ms. Bottoms also arguably characterized her examination of Weingarten and the report as part of an ongoing police "investigation" in her trial testimony, she also testified that the "goal" of the examination was the treatment of Weingarten's injuries—"[t]he health of the patient, whether they have resources for follow-up, and adequate preparation for discharge." Further, Ms. Bottoms emphasized that the documentation of a patient's injuries and their cause is intended to aid in making an appropriate diagnosis, recommending appropriate treatment, and ensuring a patient's safety.

For these reasons, we conclude that the primary purpose of Weingarten's out-of-court statements to Ms. Bottoms and as recorded in the Medical/Legal report was to obtain a medical diagnosis and treatment for her injuries. Therefore, we hold that these statements are nontestimonial and also do not implicate the Confrontation Clause.[5]

---

[5] Cody argues that the mere fact that Weingarten and Ms. Bottoms knew that Weingarten's statements could be used in a subsequent investigation or prosecution of a crime requires this Court to hold otherwise. We disagree and note that out-of-court statements made in different circumstances are often useful to prosecutors and may be used in court for a number of purposes, but that is not the test to be applied. Courts must objectively evaluate all of the relevant circumstances associated with the statements at issue and their context to determine their primary purpose at the time they were made, irrespective of their subsequent use. See Bryant, 562 U.S. at 369.

### 3. Weingarten's Statements to Law Enforcement Officers

In <u>Davis</u>, the United States Supreme Court clarified its holding in <u>Crawford</u> to hold that statements to law enforcement officials are not *always* testimonial. The Court held that whether such statements were testimonial depends, at least in part, on the "primary purpose" of the conversation or interrogation:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that *the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.*

<u>Davis</u>, 547 U.S. at 822 (emphasis added). But, as previously mentioned, the Supreme Court later explained that the correct inquiry in determining primary purpose considers "all of the relevant circumstances." <u>Clark</u>, 135 S. Ct. at 2180 (quoting <u>Bryant</u>, 562 U.S. at 368).

In its January 3, 2017 opinion letter, the circuit court found that Weingarten's "statements to Deputy Jacobsen were deliberate narrative statements made to an investigating officer in the course of an investigation[.]" While the circuit court did not specifically address Weingarten's later statements to Sergeant Schmidt, the record supports that those statements were made under similar circumstances and were undoubtedly obtained for the purpose of future criminal prosecution. It is also clear from the record that, shortly after meeting with Weingarten, officers obtained warrants for Cody alleging strangulation and domestic assault. As a result, we conclude that the primary purpose of Weingarten's out-of-court statements to Detective Jacobsen and Sergeant Schmidt were for use in an investigation or prosecution of a crime. Therefore, we hold that Weingarten's statements to Detective Jacobsen and Sergeant Schmidt are indeed testimonial in nature, thus triggering the protections afforded by the Confrontation Clause.

4. Cody's Jailhouse Phone Calls

In Crawford, the United States Supreme Court emphasized that it was not providing a "comprehensive definition" of "testimonial." Crawford, 541 U.S. at 68. Moreover, in Giles, albeit in dicta, the Supreme Court specifically noted that "[s]tatements to friends and neighbors about abuse and intimidation, and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules," because they are not testimonial within the meaning of the Confrontation Clause. Giles, 554 U.S. at 376; see also Crawford, 541 U.S. at 51 (stating that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not"). As previously noted, our Supreme Court has held that a statement is testimonial if its primary purpose is "for use in an investigation or prosecution of a crime." Sanders, 282 Va. at 164, 711 S.E.2d at 218.

On appeal, Cody generally assigns error to the circuit court's admission into evidence of *all* of Weingarten's out-of-court statements. However, regarding the preservation of this issue with respect to Weingarten's statements in the calls recorded by the jail, we conclude that any issue regarding the admissibility of these statements has been waived on appeal.

In his motion to deny Weingarten's statements, Cody sought to exclude only those statements made by Weingarten to Ms. Bottoms. In a subsequent motion *in limine* seeking to "clarify" the circuit court's earlier ruling, Cody again sought to exclude all the out-of-court statements made by Weingarten, including those made during Cody's calls to her from the jail. During a hearing on that motion, Cody withdrew his motion *in limine* with respect to Weingarten's statements to Cody in his calls from the jail but "reserved the right to renew his objection" at a later time. The record does not reflect that Cody made any further objection or motion regarding the admissibility of these statements. As a result, it appears that Cody objected pre-trial to the admission of Weingarten's statements as recorded by the jail through a pre-trial

motion *in limine*, which he withdrew and never renewed nor did he otherwise object to the admission of these statements. Thus, the record reflects that Cody abandoned his earlier legal position that the statements should be excluded and he may not adopt a different legal position on appeal. "A party may not approbate and reprobate by taking successive positions in the course of litigation that are either inconsistent with each other or mutually contradictory." Cangiano v. LSH Bldg. Co., 271 Va. 171, 181, 623 S.E.2d 889, 895 (2006). We therefore treat the issue of the admission of Weingarten's statements in the recorded jail calls as waived and do not consider it further.

C. <u>Whether Cody Forfeited his Sixth Amendment Right to Confront Weingarten.</u>

To summarize, we conclude that only Weingarten's statements to law enforcement officers constitute testimonial statements triggering the protections afforded by the Sixth Amendment's Confrontation Clause. We now turn to Cody's argument that the circuit court erred in finding that the doctrine of forfeiture by wrongdoing permitted the admission of those statements. To reach that issue, we must determine whether the doctrine applies to a situation where a defendant, by his misconduct, contacts a witness contrary to law and successfully procures a witness' unavailability through the witness' exercise of the Fifth Amendment right to avoid self-incrimination and steadfast refusal to testify notwithstanding an offer of immunity from prosecution.

As previously mentioned, <u>Crawford</u> held that the Confrontation Clause bars the admission of testimonial hearsay unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. <u>See</u> <u>Crawford</u>, 541 U.S. at 68. However, in 1878, the Supreme Court acknowledged the application of the common law doctrine of forfeiture by wrongdoing to the Confrontation Clause in <u>Reynolds v. United States</u>, 98 U.S. 145, 158 (1878). In <u>Crawford</u>, the Supreme Court acknowledged without further discussion, two exceptions to a

defendant's right to confront witnesses against him that are grounded in the basic common law principle that "one shall not be permitted to take advantage of his own wrong." Reynolds, 98 U.S. at 159; see also Crawford, 541 U.S. at 62. These exceptions to the right of confrontation are dying declarations and forfeiture by wrongdoing. See Crawford, 541 U.S. at 56 n.6, 62 (referencing Reynolds, 98 U.S. at 158-59). Four years after Crawford, in Giles v. California, the Supreme Court specifically reiterated that a defendant's right to confront witnesses against him is subject to the common law doctrine of forfeiture by wrongdoing. See Giles, 554 U.S. at 359-77. And, after a lengthy examination of both the history[6] and applicability of the doctrine of forfeiture by wrongdoing as it pertains to a defendant's Sixth Amendment confrontation rights, the majority in Giles noted that the doctrine permits the introduction of unconfronted testimonial statements "only when the defendant engaged in conduct *designed* to prevent the witness from testifying." Id. at 360. As a result, the Supreme Court emphasized that, pursuant to the doctrine of forfeiture by wrongdoing, "unconfronted testimony would *not* be admitted without a showing that the defendant intended to prevent a witness from testifying." Id. at 361.

As a preliminary matter, the doctrine of forfeiture by wrongdoing *only* applies upon a showing by a preponderance of the evidence that a witness, whose out-of-court statements are at issue, is unavailable to testify at a defendant's criminal trial. See Davis, 547 U.S. at 833 (stating that "federal courts . . . have generally held the [g]overnment to the preponderance-of-the-evidence standard" in evaluating whether a defendant has obtained the absence of a witness by wrongdoing and "[s]tate courts tend to follow the same practice"). A witness' unavailability is an easy determination when the declarant is deceased at the hands of the defendant because the

---

[6] The Supreme Court recognized that, historically, the doctrine of forfeiture by wrongdoing "permitted the introduction of statements of a witness who was 'detained' or 'kept away' by the 'means or procurement' of the defendant." Giles, 554 U.S at 359. However, the Court did not expressly limit forfeiture by wrongdoing to "physical" unavailability.

witness can never be made available regardless of the efforts of the prosecution or the court. It is more difficult to evaluate the availability of a witness who steadfastly refuses to testify, rendering them physically available but "legally" unavailable for confrontation purposes. In such cases, unavailability can only be determined when the witness is actually called to testify and, if they decline to do so, the reasons must be ascertained in the record. In this case, the circuit court concluded in its October 4, 2016 letter opinion, "it is undisputed that [Weingarten] is unavailable." She refused to testify despite being offered immunity. Additionally, in the same letter opinion, the circuit court found that "violation of a protective order pursuant to Code § 16.1-253.2 constitute[d] wrongdoing by [Cody]."

In this appeal, the determinative questions that we must answer are "whether a preponderance of the evidence establishes that Cody intended to cause Weingarten to become 'unavailable' within the meaning of the forfeiture doctrine and whether Cody's actions constitute 'wrongdoing' as a matter of law."

Cody argues that he neither committed wrongdoing nor caused Weingarten's unavailability at trial. In support, Cody points out that while the "[c]ase law is replete with examples where defendant's conduct is the direct cause of the witness' physical unavailability[,]" the present case presents a "unique scenario." Specifically, Cody argues that in invoking her Fifth Amendment privilege against self-incrimination, Weingarten was unavailable of her own accord.

Cody cites multiple cases to differentiate the present case from other situations where a defendant's conduct resulted in a witness' physical unavailability. Specifically, Cody cites cases from the United States Supreme Court, the Supreme Court of Virginia, and the United States Court of Appeals for the Fourth Circuit, including Giles v. California, 554 U.S. 252 (2008), Crawford v. Commonwealth, 281 Va. 84, 704 S.E.2d 107 (2011), United States v. Jackson, 706

F.3d 264 (4th Cir. 2013), United States v. Gray, 405 F.3d 227 (4th Cir. 2005), and United States v. Johnson, 219 F.3d 349 (4th Cir. 2000). Cody notes that the defendants in Giles, Crawford, Jackson, and Johnson each caused a witness' unavailability by bringing about their death. And, in Gray, Cody mentions that while the defendant was not charged with murder, "it was believed that [the defendant] was responsible for the death of a witness whose statements she sought to exclude." Cody distinguishes these examples from the circumstances here because Weingarten was physically present and merely "legally unavailable" to testify.[7]

Our examination of the language utilized by the Supreme Court in discussing forfeiture by wrongdoing does not suggest a conclusion that only physical unavailability is an essential requirement for forfeiture of the right of confrontation. Rather, the Supreme Court has repeatedly indicated that forfeiture by wrongdoing applies when a defendant causes a witness' unavailability at trial, by a wrongful act, undertaken with the intention of preventing the witness from testifying. Although such has been the case in its decisions, the Supreme Court has never indicated that forfeiture by wrongdoing applies *only* to situations where a defendant procures a witness' physical unavailability at trial. Again, all that is required is "wrongful conduct designed

---

[7] Cody also speculates that Weingarten exercised her Fifth Amendment right against self-incrimination to avoid potential criminal prosecution. Cody claims that because she was offered immunity for "everything except lying" and still elected to invoke her Fifth Amendment right against self-incrimination, the evidence suggests that Weingarten "provided false information as the basis of a police report in violation of [Code] § 18.2-460(D) and/or [Code] § 18.2-461 when she met with law enforcement in January of 2016[.]" Further, Cody argues that the circumstances indicate that Weingarten "likewise perjured herself by swearing to the same in her protective order affidavit in violation of [Code] § 18.2-434, a Class Five felony for which there is not limitation on prosecution." According to Cody, "[t]he only conclusion supported by the evidence is that [Weingarten's] unavailability was caused by legitimate concerns regarding becoming a witness against herself and her own criminal prosecution." As a result, Cody argues that the circuit court's conclusion that Weingarten had no basis to invoke her Fifth Amendment right against self-incrimination is inconsistent with the evidence. The circuit court, however, found Cody's speculation factually unsupported and we do not consider it.

to prevent a witness's testimony" on the part of a defendant coupled with the incapability of the witness to be subject to cross-examination. See Giles, 554 U.S. at 366.

"Wrongdoing" at common law was understood to encompass more than the commission of a criminal act. Some of our sister states have held that wrongful acts include not only crimes, such as murder, assault, threats, and other forms of intimidation, but also declarations of love, or promises to marry or to change behavior, when they are clearly intended as inducements for the witness not to testify. See, e.g., Commonwealth. v. Szerlong, 933 N.E.2d 633, 638-39 (Mass. 2010) ("A defendant's involvement in procuring a witness's unavailability need not consist of a criminal act; the 'wrongdoing' in forfeiture by wrongdoing is simply the intentional act of making the witness unavailable to testify or helping the witness become unavailable. Forfeiture by wrongdoing may include a defendant's collusion with a witness to ensure that the witness will not be heard at trial. The Commonwealth need not show that the defendant threatened, coerced, persuaded, or pressured a witness to avoid testifying, or physically prevented the witness from testifying. Where a defendant actively assists a witness's efforts to avoid testifying, with the intent to keep the witness from testifying, forfeiture by wrongdoing may be established regardless of whether the witness already decided 'on [her] own' not to testify." (quoting Commonwealth v. Edwards, 830 N.E.2d 158, 170-72 (Mass. 2005))); People v. Byrd, 855 N.Y.S.2d 505, 510-11 (N.Y. App. Div. 2008). Therefore, conduct by a defendant that is intended to prevent a witness from testifying and successfully results in a witness being unable or unwilling to do so, satisfies the requirements for application of the doctrine of forfeiture by wrongdoing.

Further, a portion of Justice Scalia's opinion in Giles—supported by a clear majority of the justices—expressly left open the possibility "that a defendant's intention to prevent testimony might be inferred from the surrounding circumstances, such as in a case of ongoing domestic

violence." Crawford, 281 Va. at 110, 704 S.E.2d at 123 (quoting Crawford v. Commonwealth, 55 Va. App. 457, 473, 686 S.E.2d 557, 564 (2009)). More specifically, Justice Scalia observed:

> The domestic-violence context is, however, relevant for a separate reason. Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime *expressed the intent* to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.

Giles, 554 U.S. at 377 (emphasis added). Moreover, a few years earlier in Davis—another case resulting from an instance of domestic violence—Justice Scalia, writing for the majority, noted:

> [W]hen defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they *do* have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system.

Davis, 547 U.S. at 833. Based on the Supreme Court's analysis in Davis and later in Giles, we hold that the doctrine of forfeiture by wrongdoing properly applies where a defendant unlawfully contacts a witness with the successful intent to procure that witness' unavailability, whether such unavailability is the witness' physical absence from the court or through a witness' refusal to testify by invoking the Fifth Amendment right to avoid self-incrimination.

Here, the record amply supports the circuit court's finding that Cody intended to and did engage in criminal conduct specifically *designed* to prevent Weingarten from testifying against him. As recognized by the circuit court in its October 4, 2016 letter opinion, in five separate violations of a protective order, Cody slowly wore down Weingarten with his persistence and

emotionally manipulative behavior and convinced her not to cooperate further in his prosecution. According to the circuit court, "[t]here is no question that [Cody] significantly interfered with [Weingarten] as a witness in making those calls." The circuit court also found that Cody exploited his control over Weingarten "to persuade [her] not to testify against him." The fact that Weingarten then retained the services of an attorney and the attorney's demand letter to the Commonwealth, "ties the persuasion by [Cody] in those five telephone calls to [Weingarten's] subsequent refusal to testify."

Based on the circuit court's factual findings, all of which are clearly supported by evidence in the record, it is evident that Cody intended to and did engage in wrongful conduct designed to prevent Weingarten from testifying against him. As a result, we hold that the circuit court properly found that Cody, by his illegal actions in tampering with a witness, forfeited his right under the Sixth Amendment to confront Weingarten.

### III. CONCLUSION

For the reasons stated above, we conclude that only Weingarten's out-of-court statements to law enforcement officers constitute testimonial statements triggering the protections afforded by the Sixth Amendment's Confrontation Clause. We further hold that, since Cody violated a protective order numerous times to unlawfully contact the victim of his crimes, repeatedly urged her to drop the charges and refuse to appear to testify against him and where, in furtherance of the result Cody sought, she made herself unavailable for confrontation through her refusal to testify by invoking her rights under the Fifth Amendment, the common law doctrine of forfeiture by wrongdoing was properly applied by the circuit court in this case. For all of these reasons, we conclude that the circuit court did not err in admitting the various out-of-court statements made by Weingarten. Therefore, the judgment of the circuit court is affirmed.

Affirmed.