IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

**FILED**
**June 2, 2021**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

January 2021 Term

No. 19-1102

STATE OF WEST VIRGINIA
Plaintiff Below, Respondent

v.

GERALD WAYNE JAKO, JR.,
Defendant Below, Petitioner

Appeal from the Circuit Court of Ohio County
The Honorable Jason A. Cuomo, Judge
Civil Action No. 19-F-8

AFFIRMED

Submitted: March 23, 2021
Filed: June 2, 2021

Robert F. Evans, Esq.
WV Public Defender Services
Appellate Advocacy Division
Charleston, West Virginia
Counsel for Petitioner

Patrick Morrisey, Esq.
Attorney General
Scott E. Johnson, Esq.
Assistant Attorney General
Office of the Attorney General
Charleston, West Virginia
Counsel for Respondent

JUSTICE WALKER delivered the Opinion of the Court.
JUSTICE WOOTON dissents and reserves the right to file a separate opinion.

SYLLABUS BY THE COURT

1.    "Pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution* bars the admission of a testimonial statement by a witness who does not appear at trial, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness."  Syllabus Point 6, *State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006).

2.    "'Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.' *State v. Louk*, 171 W.Va. 639, 301 S.E.2d 596, 599 (1983)."  Syllabus Point 2, *State v. Peyatt,* 173 W. Va. 317, 315 S.E.2d 574 (1983).

3.    "'Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt.' Syl. Pt. 5, *State ex rel. Grob v. Blair*, 158 W.Va. 647, 214 S.E.2d 330 (1975)."  Syllabus Point 21, *State v. Blevins*, 231 W. Va. 135, 744 S.E.2d 245 (2013).

4.    Before a circuit court may admit an out-of-court testimonial statement under the common law, forfeiture-by-wrongdoing doctrine, codified in Rule 804(b)(6) of the West Virginia Rules of Evidence (2014), the court must find by a preponderance of the evidence that the defendant (1) acted wrongfully, or acquiesced to the wrongful actions of

i

another; (2) did so with the intent to cause a witness to be unavailable; and (3) actually rendered the witness unavailable.

5.      To the extent that *State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006), does not limit application of the forfeiture-by-wrongdoing doctrine to when a defendant engaged in wrongdoing with the intent to obtain the absence of a witness, as required under *Giles v. California*, 554 U.S. 353 (2008), that case is modified.

6.      "The right of a criminal defendant to assistance of counsel includes the right to effective assistance of counsel."  Syllabus Point 1, *Cole v. White*, 180 W. Va. 393, 376 S.E.2d 599 (1988).

7.      "Where a constitutional right to counsel exists under W.Va. Const. art. III, § 14, there is a correlative right to representation that is free from conflicts of interest."  Syllabus Point 2, *Cole v. White*, 180 W. Va. 393, 376 S.E.2d 599 (1988).

8.      "In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."  Syllabus Point 5, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

9.	"It is the extremely rare case when this Court will find ineffective assistance of counsel when such a charge is raised as an assignment of error on a direct appeal. The prudent defense counsel first develops the record regarding ineffective assistance of counsel in a habeas corpus proceeding before the lower court, and may then appeal if such relief is denied. This Court may then have a fully developed record on this issue upon which to more thoroughly review an ineffective assistance of counsel claim." Syllabus Point 10, *State v. Triplett*, 187 W. Va. 760, 421 S.E.2d 511 (1992).

WALKER, Justice:

Petitioner Gerald Wayne Jako, Jr., and his girlfriend, Samantha England, were indicted for first-degree robbery in January 2019 for robbing a gambling parlor. Before trial, Ms. England struck a deal with the State and agreed to testify against Mr. Jako. Once Mr. Jako learned that Ms. England planned to testify, he made a series of jailhouse phone calls in which he told Ms. England to remain loyal, honest, and true to him and threatened to end their relationship if she didn't stop "running her mouth." Days later, Ms. England withdrew her plea agreement and told the State that she would not testify against him. Relying on the forfeiture-by-wrongdoing doctrine,[1] the State moved to admit Ms. England's recorded statement into evidence, despite her absence from trial and Mr. Jako's inability to cross-examine her. The circuit court granted the motion, the jury convicted Mr. Jako of first-degree robbery, and he now appeals that conviction.

We find that the circuit court did not err when it granted the State's motion to admit Ms. England's out-of-court statement under the forfeiture-by-wrongdoing doctrine. The phone calls and their effect upon Ms. England show that Mr. Jako intended to obtain Ms. England's absence from trial and that his efforts worked. And, the circuit court did not err as a matter of law when it found that Mr. Jako had engaged in "wrongdoing" that would support admission of Ms. England's out-of-court statement. We also conclude that Mr. Jako's additional assignments of error—ineffective assistance of

---

[1] U.S. CONST. amend. VI; W. VA. CONST., art. III, § 14.

1

trial counsel and a misleading answer by the circuit court to a jury question—do not merit relief. So, we affirm the circuit court's October 18, 2019, sentencing order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On August 19, 2018, Shauna Cobb was the only clerk on duty at the State Line Café, a gambling parlor in Ohio County. It's common for the doors of businesses like the café to keep their front doors locked so that a clerk like Ms. Cobb can control who enters the parlor. Around 11:30 p.m., Ms. Cobb saw Ms. England on the surveillance cameras that showed the front door of the café and she unlocked the door and allowed Ms. England to enter. Ms. England played the gambling machines for a little while, then got up to leave. Ms. England then opened the front door to the café, enabling Mr. Jako and Jeremiah Dunn to enter. The men wore masks and gloves; one held a gun and the other held a machete. At their command and with a gun pointed at her, Ms. Cobb opened the cash register and led them to the café's safe. Ms. Cobb's hands were then tied, and the trio left, making off with approximately $6,000.

After Mr. Jako, Ms. England, and Mr. Dunn had fled, Ms. Cobb discovered that Ms. England had forgotten her purse in the room with the gambling machines. Ms. Cobb found Mr. Jako's identification inside. Authorities apprehended Mr. Jako, Ms. England, and Mr. Dunn a few days later. Then, in January 2019, the grand jury indicted each for first-degree robbery and use and presentation of a firearm during the commission of a felony (i.e., first-degree robbery).

2

Ms. England reached a plea agreement with the State at the beginning of July 2019. Under that agreement, Ms. England would testify against Mr. Jako at his trial in exchange for the State's recommendation of a forty-year term of incarceration, no recommendation for a gun-specific finding, and dismissal of the second count of the indictment. Ms. England and Mr. Jako both attended a pretrial hearing on July 19, 2019. During the hearing, the State reported that Ms. England would testify at Mr. Jako's trial.[2] Ms. England had also made a lengthy statement implicating Mr. Jako, which authorities had recorded. The State gave Mr. Jako's attorney the recorded statement during the July 19 hearing.

Ms. England appeared for her plea hearing on July 30, 2019. Before the hearing began, Ms. England told her attorney that she didn't want to accept the plea agreement. Ms. England and her attorney conferred, and, at her counsel's request, Ms. England agreed to speak with the Assistant Prosecutor.[3] Ms. England told her attorney and the Assistant Prosecutor that she would not testify against Mr. Jako. When asked if she was afraid of Mr. Jako, Ms. England responded "absolutely" or "definitely." Then, during the hearing, Ms. Jako withdrew her plea agreement and stated that she could not testify

---

[2] On May 31, 2019, the State filed a notice that it intended to call Ms. England as a witness at trial. It then moved for the appropriate writ to cause Ms. England's attendance. The court granted the writ on July 30, 2019.

[3] Ms. England's attorney advised her that she would be waiving attorney-client privilege if she spoke with him in the presence of the Assistant Prosecutor. Ms. England indicated that she understood and agreed to go forward, regardless.

3

against Mr. Jako, repeating "I can't do it." The circuit court found—at the time—that Ms. England made those decisions "knowingly, intelligently, and without threat of coercion, force, or duress[.]"

Mr. Jako and Ms. England were housed at the North Central Regional Jail and the Northern Regional Jail, respectively, awaiting trial. After the July 30 hearing, the State obtained recordings of the pair's jailhouse phone calls and discovered that Mr. Jako was displeased by Ms. England's plan to testify against him. On July 23, he told a third-party during a telephone call that Ms. England's plea agreement was "bad news" and that he needed "to keep in contact with [his] b*tch."[4] Otherwise, he stated, "she gets weak; and when she gets weak, she starts telling lies on him." He was, in his words, Ms. England's "source of strength." Later that day, Mr. Jako arranged with the third-party to "merge" his calls with Ms. England's so the couple could talk to each other from their respective jails.

On the first of these three-way calls, Ms. England stated that she "was told to call the number," and told the third-party that she wanted to talk to Mr. Jako at least twice a day. When Mr. Jako joined the call, he told Ms. England that he could be anything

---

[4] The appendix record does not contain transcripts of these phone calls, although the State has submitted the recordings, themselves. Before the circuit court, the State quoted portions of the phone calls in its motion to admit Ms. England's statement and its supplement to that motion. Despite being offered the opportunity to do so by the circuit court, Mr. Jako did not respond and highlight those portions of the phone calls that he believed rebutted the State's presentation of the evidence, nor did he argue to the circuit court (or to this Court) that the State inaccurately presented the content of the pair's phone calls in its filings with the court.

she wanted him to be if she was "loyal and honest and true to" him. Mr. Jako made other statements to Ms. England, such as: (1) "I told you that I would never leave you unless you were disloyal. That is the one line that you cannot cross and come back from[;]" (2) "You're so twisted – you think it's a good thing – then you run your mouth when I'm upset. That's hoodrat thinking[;]" (3) "[I]t's your job to submit to your husband and not run your mouth[;]" (4) "[R]unning your mouth is stupid – it's not good. It's destructive[;]" and (5) "You run your f*cking mouth all the time . . . I know who you are. You're driving a wedge between us. Or there will be no us."

The tone of the conversations changed the next day. Mr. Jako confronted Ms. England, telling her first that he loved her, and then asking if she "want[ed] to come clean about anything?" Ms. England responded that she hadn't done anything. Mr. Jako then stated that Ms. England was lying and that "[he] kn[e]w things." Ms. England then conceded that "[t]he only thing I [Ms. England] have done to you is what you heard in Court on Friday. And that's something I regret." She went on: "I'm not supposed to do that. In the [B]ible, not supposed to do that. A man is not supposed to open his mouth." Later, Ms. England reassured Mr. Jako that she was "not gonna do anything stupid," and that she "got [him]" and "love[d him]." Mr. Jako also told Ms. England that he wanted to marry her and be with her for the rest of his life.

Mr. Jako interspersed warnings in his assurances of love for Ms. England and directives that she must stop "run[ning] her mouth." Examples include the following:

5

> Sam, you know, I love you too. I do the right thing by you
> every day. I could reach out to different people and sh\*t . . .
> and I don't. I don't want to talk to other people unless it's you.
> I don't ever want to be the reason you shed tears.

Mr. Jako further encouraged Ms. England to remain silent by warning her that "[t]he devil is going to use you [Ms. England] to get at me because I'm too f\*cking powerful to get at."

On August 7, 2019, the State moved to admit Ms. England's recorded statement into evidence, even though she refused to testify at trial. The State argued that Mr. Jako had rendered her unavailable to testify by "wrongdoing," and so had forfeited his right to object to the admission of Ms. England's recorded statement at trial The court held a hearing on the motion on August 15, 2019, at which the State produced recordings of Mr. Jako and Ms. England's calls. The court directed the parties to provide additional briefing regarding any other excerpts either wished the court to consider. The State supplemented its motion with additional excerpts from the recorded phone calls, but Mr. Jako did not file anything else.[5]

On August 20, 2019, the court granted the State's motion, and allowed the admission of Ms. England's recorded statement to be played at Mr. Jako's trial. The court reproduced pertinent portions of Mr. Jako and Ms. England's phone conversations,

---

[5] The court's order granting the State's motion recounts that Mr. Jako sent an e-mail to the court "advising that [he] would like the [c]ourt to consider the calls in their entirety, that the conversations speak for themselves, and that most of the calls were initiated" by Ms. England.

6

recorded between July 19, 2019 (the pretrial hearing) and July 30, 2019 (Ms. England's plea hearing). The court then considered whether Mr. Jako had obtained Ms. England's absence by wrongdoing, so that he had forfeited his constitutional right to confront her. The court found that the State had satisfied that evidentiary burden. The court reasoned that Mr. Jako knew as of the pretrial hearing that Ms. England had struck a deal with the State and planned to testify against him. The court found that the State's evidence showed that after the pretrial hearing, Mr. Jako acted to prevent Ms. England from testifying against him:

> Defendant Jako intentionally reached out to co-Defendant England knowing not only that she was a potential witness against him, but that she was as part of her plea agreement going to testify against him. While the dialogue between Defendant Jako and co-Defendant England was not one of threats, it appears the Defendant instead used manipulation and emotions. Defendant Jako clearly attempted to use his knowledge of co-Defendant's feelings for Defendant Jako and manipulated her and coerced her into backing out of her plea agreement. . . .[6]

> This [c]ourt **FINDS** and **HOLDS** that the State has proven beyond a preponderance of the evidence that Defendant Jako by his wrongdoing has coerced or manipulated co-Defendant England into renouncing her plea agreement, and thus, wrongfully sought to "obtain her absence."

---

[6] Internal note omitted.

The court then ordered that the State could admit Ms. England's recorded statement of July 10, 2019, into evidence if she refused to testify at Mr. Jako's trial.[7]  After Ms. England refused to testify at Mr. Jako's trial, the court found her to be "unavailable."

Before Mr. Jako's trial could begin on August 20, 2019, his attorney, Mark Panepinto, told the court that he knew the owner of the gambling parlor and the owner of the real estate on which it was located "quite well," and had even vacationed with them. Mr. Panepinto represented to the court that he had only learned of this connection the weekend before trial, when he reviewed "every little line" of discovery.  The court questioned Mr. Panepinto after he made that disclosure:

> The court:    And do you believe that any of these things you've raised today prevent you from acting ethically in a professional manner in representing your client as best you can in a diligent manner?
>
> Mr. Panepinto:    Oh, I don't.  Mr. Jako is concerned about that.
>
> The court:    Okay.  But I'm asking you, though.
>
> Mr. Panepinto:    No, I don't.
>
> The court:    Do you believe that because of these contacts or previous relationships that you've had with these people that you've done things that you should not have done or that you didn't do things that you should have in this case?

---

[7] The court preserved Mr. Jako's right to object to Ms. England's statement on other grounds (for example, for relevancy under West Virginia Rule of Evidence 401).  The court also granted Mr. Jako leave to admit an August 2018 statement from Ms. England to rebut her later statement, subject to the State's objections on other evidentiary grounds.

Mr. Panepinto:　　　No, Your Honor.

The State did not move to disqualify Mr. Panepinto and the Court did not find that he had an actual conflict of interest. Neither the owner of the gambling parlor nor the owner of the real estate testified at trial.

At the end of the four-day trial, the court instructed the jury on robbery in the first-degree (with a special interrogatory on brandishing a weapon), the lesser included charge of grand larceny, and use of a firearm during the commission of a felony. Mr. Jako objected only to the court's burden of proof instruction. During deliberations, the jury posed this question to the court: "If there is belief the crime was staged, can we still find the defendant guilty of robbery in the first degree?" The court relayed the question to the parties and asked for their thoughts. They told the court that they were close to reaching a plea deal, so the court did not return an answer to the jury. Then, after about an hour, the court told the parties that it would send back this answer to the jury: "The court cannot answer this question specifically. You are to be guided solely by the application of the law already given to you to the facts as you find them." Mr. Jako did not object to that answer.

The jury found Mr. Jako guilty of first-degree robbery.[8] On September 3, 2019, he moved for a new trial, arguing that the jury had misunderstood the distinction

---

[8] The jury did not find that Mr. Jako had brandished a firearm while committing that crime or that he had used or presented a firearm during the commission of a felony.

9

between grand larceny and first-degree robbery.[9]  The court denied that motion on September 16, 2019.  Then, on October 18, 2019, the court sentenced Mr. Jako to 100 years' incarceration on his conviction of first-degree robbery.  Mr. Jako appeals from that sentencing order.

## II. STANDARD OF REVIEW

Mr. Jako's appeal invokes three distinct standards of review, so we incorporate each standard in the discussion of the corresponding assignment of error.

## III. ANALYSIS

Mr. Jako assigns three errors to the proceedings before the circuit court. First, he asserts that the circuit court erred by admitting Ms. England's out-of-court statement into evidence, despite her absence from trial and Mr. Jako's inability to cross-examine her.  Second, he contends that trial counsel suffered from an actual conflict of interest that rendered him unable to provide Mr. Jako with effective assistance.  Finally, he argues that the circuit court's response to the jury's question was plain error.  We address each assignment of error, in that order, below.

---

[9] Mr. Jako made two additional arguments, which the court also rejected.  Mr. Jako does not raise those issues on appeal.

*A.*     *Admission of Ms. England's Out-of-Court Statement*

"The Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution* guarantee an accused the right to confront and cross-examine witnesses."[10]  More particularly,

> [p]ursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution* bars the admission of a testimonial statement by a witness who does not appear at trial, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness.[11]

The parties do not dispute that Ms. England was unavailable for trial or that her recorded statement was testimonial.[12]  So, the question before the Court is whether the admission of Ms. England's out-of-court statement was justifiable under the forfeiture-by-wrongdoing doctrine?  We conclude that it was, and that the circuit court did not err when it admitted the out-of-court statement.

We review the admission of Ms. England's out-of-court statement—an evidentiary ruling—for abuse of discretion.  "'Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should be not be disturbed unless there

---

[10] *State v. Mechling*, 219 W. Va. 366, 371, 633 S.E.2d 311, 316 (2006).

[11] Syl. Pt. 6, *id.*

[12] *See* Syl. Pt. 9, *id.*

11

has been an abuse of discretion.'"[13]  "[U]nder an abuse of discretion standard; the underlying facts are reviewed under a clearly erroneous standard; and questions of law and interpretations of statutes and rules are subject to a *de novo* review."[14]  Mr. Jako alleges a violation of his confrontation rights, which is "'reversible error unless it can be shown that the error was harmless beyond a reasonable doubt.'"[15]  Guided by that standard, we turn to the applicable law.

### 1.  *Forfeiture-by-Wrongdoing Doctrine*

"Although out-of-court statements ordinarily may not be admitted to prove the truth of the matters asserted,[16] the doctrine of forfeiture by wrongdoing allows such statements to be admitted where the defendant's own misconduct rendered the declarant unavailable as a witness at trial."[17]  The doctrine rests on a simple premise:  the Confrontation Clause is not a "windfall" for the defendant who "procur[es] or coerc[es]

---

[13] Syl. Pt. 2, *State v. Peyatt*, 173 W. Va. 317, 315 S.E.2d 574 (1983) (quoting *State v. Louk*, 171 W. Va. 639, 643, 301 S.E.2d 596, 599 (1983)).  *See State v. Martin*, No. 13-0112, 2013 WL 5676628, at *2 (W. Va. Oct. 18, 2013) ("Three separate levels of scrutiny apply to Confrontation Clause claims: The circuit court's order is reviewed for abuse of discretion; its factual findings are reviewed for clear error; and its legal rulings are reviewed de novo.") (memorandum decision); *State v. Jessica M.*, 226 W. Va. 242, 248–49, 700 S.E.2d 302, 307–08 (2010) (applying *Peyatt* to alleged deprivation of confrontation right).

[14] Syl. Pt. 1, in part, *State v. Head*, 198 W. Va. 298, 480 S.E.2d 507 (1996).

[15] Syl. Pt. 21, *State v. Blevins*, 231 W. Va. 135, 744 S.E.2d 245 (2013) (quoting Syl. Pt. 5, *State ex rel. Grob v. Blair*, 158 W. Va. 647, 214 S.E.2d 330 (1975)).

[16] *See* W. VA. R. EVID. 801(c) and 802.

[17] *United States v. Gray*, 405 F.3d 227, 240 (4th Cir. 2005).

silence from witnesses and victims[.]"[18]  "The goal of the doctrine [is] to remove the otherwise powerful incentive for defendants to intimidate, bribe, and kill the witnesses against them—in other words, it is grounded in the ability of the courts to protect the integrity of their proceedings."[19]

Federal courts have concluded that Federal Rule of Evidence 804(b)(6) is a codification of the common law forfeiture-by-wrongdoing doctrine as an exception to the general bar on the admission of hearsay testimony.[20]  Because West Virginia Rule of Evidence 804(b)(6) duplicates the federal rule, we also find that it is a codification of the common law doctrine of forfeiture-by-wrongdoing.  Our Rule 804(b)(6) states that:

> The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness: . . . *Statement offered against a party that wrongfully caused the declarant's unavailability.* — A statement offered against a party that wrongfully caused — or acquiesced in wrongfully causing — the declarant's unavailability as a witness, and did so intending that result.

---

[18] *Davis v. Washington*, 547 U.S. 813, 833 (2006).

[19] *People v. Reneaux*, 50 Cal. App. 5th 852, 865 (2020), *reh'g denied* (July 14, 2020), *review denied* (Aug. 26, 2020) (internal quotations omitted).

[20] *See Giles v. California*, 554 U.S. 353, 367 (2008) (describing Federal Rule of Evidence 804(b)(6) as codification of the common law doctrine of forfeiture); *Davis*, 547 U.S. at 833 (same); *Gray*, 405 F.3d at 241 ("Fed.R.Evid. 804(b)(6), which took effect in 1997, codifies the common-law doctrine of forfeiture by wrongdoing as an exception to the general rule barring admission of hearsay evidence.").

Under the rule, (1) when a person acts wrongfully, or acquiesces to the wrongful actions of another; (2) does so with the intent to cause a witness to be unavailable; and (3) actually renders the witness the witness unavailable, the witness's out-of-court, testimonial statement against the party may be admitted into evidence.[21]

We have observed that "[t]he U.S. Supreme Court has suggested that the government must meet a preponderance-of-the-evidence standard"[22] when determining

---

[21] *See Giles*, 554 U.S. at 359 (holding that the forfeiture-by-wrongdoing doctrine applies only "when the defendant engaged in conduct *designed* to prevent the witness from testifying") (emphasis in original); *United States v. Dinkins*, 691 F.3d 358, 383 (4th Cir. 2012) ("Before applying the forfeiture-by-wrongdoing exception, a trial court must find, by a preponderance of the evidence, that '(1) the defendant engaged or acquiesced in wrongdoing (2) that was intended to render the declarant unavailable as a witness and (3) that did, in fact, render the declarant unavailable as a witness.'") (quoting *Gray*, 405 F.3d at 241); *Cody v. Commonwealth*, 812 S.E.2d 466, 482 (Va. Ct. App. 2018) ("Based on the Supreme Court's analysis in *Davis* and later in *Giles*, we hold that the doctrine of forfeiture by wrongdoing properly applies where a defendant unlawfully contacts a witness with the successful intent to procure that witness' unavailability, whether such unavailability is the witness' physical absence from the court or through a witness' refusal to testify by invoking the Fifth Amendment right to avoid self-incrimination.").

Of course, the out-of-court statement would still be subject to other limitations upon the admission of evidence. *See, e.g.*, W. Va. R. Evid. 401 and 402.

[22] *Mechling*, 219 W. Va. at 381, 633 S.E.2d at 326 (citing *Davis*, 547 U.S. at 833 (stating that "federal courts using Federal Rule of Evidence 804(b)(6) . . . have generally held the Government to the preponderance-of-the-evidence standard . . . . State courts tend to follow the same practice")).

In *Mechling* we stated that the Supreme Court had "suggested that . . . if a hearing on forfeiture is required, hearsay evidence may be considered by the trial court." *Id*. (citing *Davis*, 547 U.S. at 833). In the fifteen years since we decided *Mechling*, the Supreme Court has not revisited that suggestion and the federal Circuit Courts of Appeal have split regarding the procedural prerequisites to application of the doctrine. *See* Tim Donaldson, *A Reliable and Clear-Cut Determination: Is A Separate Hearing Required to Decide When Confrontation Forfeiture-by-wrongdoing Applies?*, 49 New Eng. L. Rev. 167, 167–69

whether the government has shown that a defendant has forfeited by wrongdoing the prohibition against admission of testimonial, out-of-court statement. That observation holds true, today—most federal Courts of Appeals adhere to preponderance-of-the-evidence.[23] We see no reason to adopt a different standard.

So, in light of the preceding discussion, we now hold that before a circuit court may admit an out-of-court testimonial statement under the common law, forfeiture-by-wrongdoing doctrine, codified in Rule 804(b)(6) of the West Virginia Rules of Evidence (2014), the court must find by a preponderance of the evidence that the defendant (1) acted wrongfully, or acquiesced to the wrongful actions of another; (2) did so with the intent to cause a witness to be unavailable; and (3) actually rendered the witness unavailable.

### 2.    *Intent to Obtain the Witness's Absence and Mechling*

Before we take up the parties' arguments, we pause to consider Syllabus Point 11 of *Mechling*, which states that: "[u]nder the doctrine of forfeiture, an accused who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation."[24] The primary issue in *Mechling* was whether certain statements made by

---

(2015). Mr. Jako does not challenge the sufficiency of the hearing conducted by the circuit court on the forfeiture issue or its consideration of testimony recounting Ms. England's out-of-court statement confirming her fear of Mr. Jako, so we do not consider the issue.

[23] *See Gray*, 405 F.3d at 241 n.8; *see also* Fed. R. Evid. 804, cmt. to subdivision (b)(6) (1997) ("The usual Rule 104(a) preponderance of the evidence standard has been adopted in light of the behavior the new Rule 804(b)(6) seeks to discourage.").

[24] *Mechling*, 219 at 366, 633 S.E.2d at 311.

15

a domestic violence victim were "testimonial," and so subject to the Confrontation Clause.[25] After resolving that issue, we considered the tension between a domestic abuser's confrontation right and his victim's understandable reticence to testify against him in open court.[26]

Our discussion was informed by the United States Supreme Court's decision in *Davis v. Washington*, in which the Supreme Court also addressed a defendant's confrontation right in the context of a domestic abuse prosecution.[27] Notably, in *Davis*, the Supreme Court stated that, "[O]ne who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation"[28]—language identical to Syllabus Point 11 of *Mechling*. Importantly, neither the Supreme Court's statement in *Davis* nor Syllabus Point 11 of *Mechling* limits application of the forfeiture-by-wrongdoing doctrine to when an accused engaged in wrongdoing *with the intent to obtain the witness's absence*.

Two years after *Davis* and *Mechling*, the Supreme Court decided *Giles v. California*, and held that the forfeiture-by-wrongdoing doctrine "applied only when the defendant engaged in conduct *designed* to prevent the witness from testifying."[29] That

---

[25] *Id*. at 371–79, 633 S.E.2d at 316–23.

[26] *Id*. at 379–81, 633 S.E.2d at 324–26.

[27] *Davis*, 547 U.S. at 832–33.

[28] *Id*. at 833.

[29] *Giles*, 554 U.S. at 359 (emphasis in original).

holding articulated a feature of the forfeiture-by-wrongdoing doctrine at common law at the time of the Founding: "unconfronted testimony would *not* be admitted without a showing that the defendant intended to prevent a witness from testifying."[30] Syllabus Point 11 of *Mechling* conflicts with the Supreme Court's holding in *Giles* because it does not restrict application of the forfeiture-by-wrongdoing doctrine to when a defendant engages in wrongful conduct with the intent to obtain the witness's absence. And, it conflicts with Rule of Evidence 804(b)(6), which also contains a specific intent requirement: "The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness: . . . A statement offered against a party that wrongfully caused — or acquiesced in wrongfully causing — the declarant's unavailability as a witness, and *did so intending that result*." So, we now hold that to the extent that *State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006), does not limit application of the forfeiture-by-wrongdoing doctrine to when a defendant engages in wrongdoing with the intent to obtain the absence of a witness, as required under *Giles v. California*, 554 U.S. 353 (2008), that case is modified. We now apply these holdings to Mr. Jako's first assignment of error.

### 3. *The Forfeiture Doctrine, Applied*

Mr. Jako argues that the circuit court erred when it found that he had engaged in "wrongdoing" because the jailhouse phone calls "did not include threats, coercion, intimidation, or bribes." He stresses that there was not a history of domestic violence

---

[30] *Id*. at 361 (emphasis in original).

between him and Ms. England that would "elevate the phone conversations to conduct so abhorrent that it justified forfeiture of [his] constitutional rights." He also argues that Ms. England called *him* and that she could have ended the calls at any point if she had felt threatened. And, he contends that the facts do not support the circuit court's finding that Ms. England was afraid of him, the backdrop to its ruling admitting her out-of-court statement.

The State responds that courts construe the forfeiture-by-wrongdoing doctrine broadly. So, courts have not limited the wrongdoing necessary to trigger application of the doctrine to criminal conduct, nor even threatening words or actions. The State argues that wrongful acts may include a significant interference with a witness's appearance at trial, and even declarations of love. In reply, Mr. Jako attempts to distinguish the facts of the cases cited by the State, dismissing them because they arise from circumstances of domestic abuse, murder, and overt instructions not to testify.

We first consider the circuit court's finding that Mr. Jako acted with the intent to render Ms. England unavailable to testify at trial. The State's evidence showed that Mr. Jako first learned of Ms. England's plan to testify against him on July 19, 2019. Four days later, he arranged with a third-party to speak with Ms. England. Before speaking to Ms. England, Mr. Jako told that third-party that Ms. England's plan to testify was "bad news;" that when she gets weak, she lies about him; and that he is her source of strength.

The State's evidence showed that Mr. Jako did all those things in the telephone calls that followed. He urged Ms. England to be "loyal and honest and true to" him and threatened to leave her if she showed disloyalty. He discouraged her from "run[ning her] mouth" and directed her to "submit to [her] husband."[31] He expressly conditioned his continued love on Ms. England's loyalty, telling her:

> If you can't stop yourself from doing this hoodrat sh*t, then you can't be with me because you're going to put me in bad situations. Please for once, be real. Tell me right now, if you're capable or if you are not willing to be what I want. Maybe you're not the one. You continually do this sh*t that I can't accept. I need you to be honest. Are you or are you not the one?

When viewed in their totality, the facts recounted above paint a clear picture of a defendant dissuading a witness from testifying against him and acting with the intent to do so. So, we conclude that circuit court did not err when it found that Mr. Jako acted with the intent to render Ms. England unavailable to testify at trial.

Similarly, we see no error in the circuit court's finding that Mr. Jako's actions actually caused Ms. England's unavailability for trial. Before her calls with Mr. Jako, Ms. England planned to testify against him. After the calls, she refused to testify against him. Although given an opportunity to present evidence at the hearing on the State's motion to

---

[31] It does not appear that Ms. England and Mr. Jako are husband and wife. But, Mr. Jako does not contend that he was referring to anyone other than himself when telling Ms. England to submit to her husband, so we find no clear error in the circuit court's assumption that in the context of this conversation, Mr. Jako was Ms. England's "husband."

19

admit Ms. England's out-of-court statement, Mr. Jako did not offer any evidence tending to show an alternative reason for Ms. England's change of heart. Plus, Ms. England's own words show the effect Mr. Jako had upon her. When Mr. Jako asked Ms. England if she wanted to "come clean about anything," she responded that she hadn't done anything. Then, when Mr. Jako told her that he "knew things," Ms. England told him that she regretted what she had done at the pretrial conference, i.e., that she had accepted a plea agreement and agreed to testify against him. Later, Ms. England told Mr. Jako, "I got you. I love you," a strong indication that she no longer planned to testify against him. Based on that undisputed evidence, we see no error in the circuit court's finding that Mr. Jako's actions caused Ms. England's absence from trial.

We are left to examine whether Mr. Jako acted "wrongfully." Mr. Jako contends that his actions cannot amount to "the abhorrent behavior"[32] necessary to forfeit his right to confront Ms. England, as a matter of law. Applying relevant cases to the undisputed evidence before the circuit court leads us to the opposite conclusion.[33]

First, courts *do* construe the forfeiture-by-wrongdoing doctrine broadly to effect its purpose: to permit courts to guard the integrity of judicial proceedings and to prevent defendants to benefit from their own bad acts.[34] Second, other courts have found

---

[32] Fed. R. Evid. 804, cmt. to subdivision (b)(6).

[33] *See* Syl. Pt. 1, *Head*, 198 W. Va. at 298, 480 S.E.2d at 507.

[34] *See Dinkins*, 691 F.3d at 383 ("The purpose of the forfeiture-by-wrongdoing exception is to prevent 'abhorrent behavior which strikes at the heart of the system of

that persistent "emotionally manipulative" behavior and exploitation of control over a witness may amount to wrongdoing sufficient to forfeit the defendant's right to confront an unavailable witness.[35] In *Cody v. Commonwealth*, the defendant, a domestic abuser, violated a protective order to call his victim from jail five times.[36] He professed his love for the victim, remorse for his actions, desire to rebuild the couple's family, and change in attitude.[37] The defendant asked his victim to release the protective order and drop the charges against him.[38] Later, the victim obtained an attorney and invoked her Fifth Amendment privilege against self-incrimination.[39] Upon the Commonwealth's motion, the trial court admitted the victim's out-of-court statements regarding the abuse, finding that the defendant had manipulated and used his control over the victim to obtain her unavailability.[40]

---

justice itself.'") (quoting FED. R. EVID. 804(b)(6) advisory comm. note (citation and internal quotation marks omitted)); *Gray*, 405 F.3d at 242 ("Federal courts have sought to effect the purpose of the forfeiture-by-wrongdoing exception by construing broadly the elements required for its application.").

[35] *See Cody*, 812 S.E.2d at 482.

[36] *Id*. at 470.

[37] *Id*. at 470–72.

[38] *Id*. at 472.

[39] *Id*.

[40] *Id*. at 472–74.

In *Cody*, the Court of Appeals of Virginia affirmed the trial court's ruling admitting the hearsay statements. The court found that ample evidence "support[ed] the circuit court's finding that [the defendant] intended to and did engage in criminal conduct specifically *designed* to prevent [the victim] from testifying against him."[41] Relevant to this case, the court affirmed the trial court's finding that the defendant had engaged in wrongful conduct when he "slowly wore down [the victim] with his persistence and emotionally manipulative behavior and convinced her not to cooperate further in his prosecution."[42]

A recent decision by a California appellate court is also instructive.[43] In *People v. Reneaux*, the defendant was found guilty of inflicting bodily harm upon and falsely imprisoning his girlfriend, among other crimes.[44] The trial court admitted some of the victim's out-of-court statements regarding the abuse under the forfeiture-by-wrongdoing doctrine.[45] The trial court based its finding of wrongdoing upon a series of

---

[41] *Id*. at 482 (emphasis in original).

[42] *Id*.

[43] *Reneaux*, 50 Cal. App. 5th at 859.

[44] *Id*. Defendant was also convicted for crimes related to dissuading his girlfriend not to testify against him. Those convictions do not alter our forfeiture-by-wrongdoing analysis because it is "clear that [the wrongful conduct requirement of Rule 804(b)(6)] is intended to encompass more than just criminal conduct." 30B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. EVID. § 7033 (2020 ed.).

[45] *Reneaux*, 50 Cal. App. 5th at 862.

phone calls made by the defendant to his victim. Those calls closely resemble the phone

calls at issue in this case.[46]

---

[46] The following excerpt from the calls in *Reneaux* demonstrate those similarities:

> [Defendant]: You need to call, baby, and say you made another false report, that's it.

> [E.]: OK.

> [Defendant]: And that this was all a f*ckin' lie baby. Baby?

> [E.]: Alright.

> [Defendant]: That's the only way, I'm telling you, that's the only f*ckin' thing you can do, baby. I'm telling you because I f*ckin', baby, I wanna f*ckin' marry you, and I wanna f*ckin' be with you but[--]

> [E.]: I know baby.

> [Defendant]: If I go to f*ckin' prison, [E.], and I don't have you anymore, baby, I don't wanna f*ckin', I don't wanna f*ckin' be out.

> [E.]: I know baby. You're not going. I'm gonna, I'm getting you out.

> [Defendant]: Baby, for real.

> [E.]: Huh?

The California Court of Appeal, Third District, affirmed the trial court's ruling to admit the victim's out-of-court statement under the forfeiture-by-wrongdoing doctrine. As in this case, the appellate court "recognize[d] defendant's statements [] were not explicitly threatening or directive."[47] But, in view of the "the broad construction of the elements required for the application of this doctrine, and the underlying purpose to prevent defendant from undermining the judicial process, [the Court of Appeal did] not find such explicit behavior to be necessary."[48] After a lengthy examination of pertinent state and federal authority, the Court of Appeal affirmed the trial court's ruling admitting the victim's out-of-court statements, concluding that:

> Depending on the facts, trial strategies, letters and phone calls from jail colluding or confirming that a witness will not appear, and even a marriage proposal may constitute

[Defendant]: Look at me baby. You're the only place I wanna f*ckin' be, baby, is in your f*ckin' arms.

[E.]: I know baby.

[Defendant]: C'mon [E.]. Go f*ckin' do this baby.

[E.]: I will. I'm going to do it tomorrow morning, I promise.

*Id*. at 860–61.

[47] *Id*. at 868. *See also Cody*, 812 S.E.2d at 481 ("The Commonwealth need not show that the defendant threatened, coerced, persuaded, or pressured a witness to avoid testifying, or physically prevented the witness from testifying.").

[48] *Reneaux*, 50 Cal. App. 5th at 868.

wrongdoing for purposes of the forfeiture-by-wrongdoing doctrine if the defendant engaged in those actions with the intent to prevent the witness from testifying.[49]

These cases refute Mr. Jako's argument that his actions cannot be considered "wrongful." Mr. Jako went further than simply expressing feelings of affection for Ms. England. He explicitly conditioned the continuation of their relationship upon her constant loyalty, telling Ms. England that he wanted to marry her. By turns, he bullied her, belittled her, and demanded that she submit to him. While the record does not indicate that Mr. Jako had ever physically abused Ms. England, he exerted enough power over her to persuade her to abandon a plea deal that earned her a sentencing recommendation from the State, no recommendation for a gun-specific finding, and dismissal of the second count of the indictment.

Mr. Jako highlights the circuit court's finding that he did not threaten Ms. England and argues that even if he had, the threats could not have influenced Ms. England because she was housed in a different jail and knew that he could not harm her. Without threats, he reasons, his actions were not wrongful. While we agree with the circuit court that Mr. Jako did not make an overt threat of violence to Ms. England, his statements certainly intimated the possibility. Mr. Jako told Ms. England that he could "reach out to different people and sh*t," but that he did not want to talk to people other than Ms. England

---

[49] *Id*. at 873.

25

because he did not "ever want to be the reason that [she] shed tears." One can reasonably infer that Mr. Jako was telling Ms. England that, even though they were housed in different jails, he could still "reach out" to others who could harm her. By arranging with the third-party for the phone calls, he demonstrated that he had access to others on the "outside," and Ms. England stated that she had been told to call the third-party. The undisputed facts demonstrate Mr. Jako's reach: from his jail, to the outside, then to Ms. England.

Finally, in *Giles*, the Supreme Court of the United States warned against a "special, improvised Confrontation Clause for those crimes that are frequently committed against women"[50]—a special rule Mr. Jako asks for, too. We agree with that Court that domestic violence is an abhorrent, particularly destructive crime. But we also agree that the remedy lies in the hands of the Legislature. That body "may choose to combat through many means—from increasing criminal penalties to adding resources for investigation and prosecution to funding awareness and prevention campaigns. But for that serious crime, as for others, abridging the constitutional rights of criminal defendants is not in the State's arsenal."[51]

In sum, in view of the cases cited above, and their application to the undisputed evidence presented by the State to the circuit court, we reject Mr. Jako's argument that, as a matter of law, his actions do not amount to "wrongdoing" for purposes

---

[50] *Giles*, 554 U.S. at 376.

[51] *Id*.

26

of the forfeiture-by-wrongdoing doctrine.  So, we find that Mr. Jako is entitled to no relief on this assignment of error.

## B.     *Ineffective Assistance of Counsel*

Mr. Jako argues that the circuit court violated his Sixth Amendment right to the effective assistance of counsel when it failed to disqualify his trial counsel who, Mr. Jako asserts, labored under an actual conflict of interest.  And, he argues, trial counsel failed to timely disclose the conflict; he was not given enough time to secure new, conflict-free representation; and counsel's representation was less than zealous due to the conflict. The State responds that Mr. Jako has not met the burden to demonstrate an actual conflict of interest, and, in the alternative that these arguments are best pursued by a petition for *habeas corpus*.  We agree with the State's final point and so decline to address the merits of Mr. Jako's argument.

"The right of a criminal defendant to assistance of counsel includes the right to effective assistance of counsel."[52]  "Where a constitutional right to counsel exists under W.Va. Const. art. III, § 14, there is a correlative right to representation that is free from conflicts of interest."[53]

> In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington,* 466 U.S. 668, 104

---

[52] Syl. Pt. 1, *Cole v. White*, 180 W. Va. 393, 376 S.E.2d 599 (1988).

[53] Syl. Pt. 2, *id*.

S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.[54]

*Strickland* notwithstanding, "[u]nder state and federal constitutional law, 'a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.'"[55] Importantly for Mr. Jako, "[t]o demonstrate an actual conflict, [he] must identify specific evidence in the record that suggests that his or her interests were compromised."[56]

An insufficient record prevents us from addressing Mr. Jako's arguments that trial counsel was ineffective. In Syllabus Point 10 of *State v. Triplett*, this Court held:

> It is the extremely rare case when this Court will find ineffective assistance of counsel when such a charge is raised as an assignment of error on a direct appeal. The prudent defense counsel first develops the record regarding ineffective assistance of counsel in a habeas corpus proceeding before the lower court, and may then appeal if such relief is denied. This Court may then have a fully developed record on this issue

---

[54] Syl. Pt. 5, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

[55] *State ex rel. Dunlap v. McBride*, 225 W. Va. 192, 203, 691 S.E.2d 183, 194 (2010) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 349–50 (1980)).

[56] *Id*. (internal quotations omitted).

28

upon which to more thoroughly review an ineffective assistance of counsel claim.[57]

That is "'the preferred way of raising ineffective assistance of . . . counsel is to file a subsequent petition for a writ of habeas corpus raising the issue in the court below.'"[58] Otherwise, "[l]acking an adequate record, an appellate court simply is unable to determine the egregiousness of many of the claimed deficiencies."[59] That is the case, here.

Mr. Jako's appellate counsel stated at oral argument that Mr. Jako did not seek a new trial on this ground; rather, that he was seeking remand to the circuit court for a hearing to develop a record to support the claim. This is a tacit admission that the record, in its current state, is insufficient for this Court to review Mr. Jako's argument that trial counsel had a conflict of interest that actually affected the adequacy of his representation of Mr. Jako. Consequently, "we decline to address an alleged ineffective assistance of counsel claim in this direct appeal. The record has not been developed on this issue. This is an issue that must be developed in a habeas corpus proceeding."[60]

---

[57] 187 W. Va. 760, 421 S.E.2d 511 (1992).

[58] *Watts v. Ballard*, 238 W. Va. 730, 735 n.7, 798 S.E.2d 856, 861 n.7 (2017) (quoting *McNemar v. Ballard*, No. 11-0606, 2012 WL 5990127, *5 (W. Va. Nov. 30, 2012) (memorandum decision)).

[59] *Miller*, 194 W. Va. at 15, 459 S.E.2d at 126.

[60] *State v. Richardson*, 240 W. Va. 310, 319–20 n.13, 811 S.E.2d 260, 269–70 n.13 (2018).

*C.*      ***The Jury's Question***

The circuit court instructed the jury on first-degree robbery and the lesser-included offense of grand larceny. Mr. Jako did not object to the instructions. During deliberations, the jury asked the court the following question: "If there is belief the crime was staged, can we still find the defendant guilty of robbery in the first degree?" The court responded that it could not "answer this question specifically. You are to be guided solely by the application of the law already given to you to the facts as you find them." Mr. Jako did not object to the court's answer.

We may act to correct to an error that was not raised before the trial court when there is "(1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings."[61] Because Mr. Jako has not established that the circuit court erred, let alone did so plainly, we find that he is not entitled to relief on this assignment of error.

Mr. Jako argues that the jury's question "reflected a fundamental misunderstanding regarding the elements of first degree robbery and the lesser included offense of grand larceny," because if the jury believed the crime was staged, then it could not have found him guilty of first-degree robbery beyond a reasonable doubt. So, according to Mr. Jako, the circuit court erred by referring the jury back to the charge, rather

---

[61] Syl. Pt. 7, in part, *Miller*, 194 W. Va. at 3, 459 S.E.2d at 114.

30

than answering the question in "'a plain, clear manner so as to enlighten rather than confuse them.'"[62]

We disagree that the circuit court's answer was error. "[A] 'trial court has discretion in determining how best to respond to a jury question. We will review any such response for an abuse of discretion.'"[63] In *State v. Davis*, we considered the following question from the jury and answer by the court:

> The last note sent to the trial court asked the court to verify (1) whether second degree murder was with malice and unlawful, but without intent and (2) whether voluntary manslaughter was without malice, but with intent. The circuit court responded to the question by reading to the jury its previous instructions on the elements of second degree murder and voluntary manslaughter.[64]

We found that, although the circuit court's instructions on second-degree murder and voluntary manslaughter were correct, the jury's question "clearly indicate[d] that they failed to understand that malice was previously defined as including intent[.]"[65] Because the jury had already been instructed on the elements of those crimes, the jury's

---

[62] *State v. Davis*, 220 W. Va. 590, 595, 648 S.E.2d 354, 359 (2007) (quoting *Smith v. State*, 596 S.E.2d 13, 15 (Ga. Ct. App. 2004)).

[63] *Id*. at 593, 648 S.E.2d at 357 (quoting *People v. Sanders*, 857 N.E.2d 948, 952 (Ill. 2006)).

[64] *Id*. at 592–93, 648 S.E.2d at 356–57 (internal note omitted).

[65] *Id*. at 595, 648 S.E.2d at 359.

31

question—which asked for a restatement of the elements of the crimes—could not be resolved by hearing those same instructions, again.[66]

We disagree with Mr. Jako's assertion that the question and answer in this case are like those in *Davis*. First, in *Davis*, the jury's question demonstrated a fundamental misunderstanding of the elements of second-degree murder and voluntary manslaughter. But in this case, the jury asked the court to tell it whether a particular factual situation (a staged crime) fit the elements of the crime of robbery in the first-degree. As opposed to the question in *Davis*, the jury's question in this case did not seek clarification of the elements of the crime of first-degree robbery. Instead, the jury asked the court to step into its role as factfinder.

Second, had the circuit court gone further, it would have veered into opinion territory. "[A] trial court may exercise its discretion and properly decline to answer a jury's inquiries . . . if the giving of an answer would cause the court to express an opinion that would likely direct a verdict one way or another."[67] Had the circuit court answered 'yes,' to the jury's question, then it would have opined that "a belief" that a crime was staged was sufficient to preclude the jury from finding that the State had satisfied the elements of first-degree robbery beyond a reasonable doubt. If the circuit court had answered 'no,' then it would have likely led the jury to the opposite verdict. A direct "yes" or "no" answer the

---

[66] *Id*.

[67] *People v. Tomes*, 672 N.E.2d 289, 292 (Ill. Ct. App. 1996).

32

jury's question would have "risked stamping the court's imprimatur"[68] on one of Mr. Jako's theories of the case: that Ms. Cobb, the employee on duty at the time of the robbery, was in on the crime. For those reasons, we cannot find that the circuit court's answer to the jury's question was error, so that Mr. Jako has failed to surmount the initial hurdle of the plain error standard of review.

## IV. CONCLUSION

For the reasons discussed above, we affirm the circuit court's October 18, 2019, sentencing order.

Affirmed.

---

[68] *United States v. Ellis*, 121 F.3d 908, 925 (4th Cir. 1997).